Vincent M. DEMARCO, Bruce G. O'Brien, On Behalf of Themselves and All Others Similarly Situated, Plaintiffs,

v.

DEPOTECH CORPORATION, Edward L. Erickson, Sinil Kim, Defendants.

No. 98CV0675W POR.

United States District Court, S.D. California.

Jan. 26, 2001.

See, also, 131 F. Supp.2d 1185.

William S Lerach, Milberg Weiss Bershad Hynes and Lerach, San Diego, CA, Sherrie R Savett, Berger & Montague, Philadelphia, PA, for Vincent M DeMarco, Bruce G. O'Brien, plaintiffs.

Christopher Harold McGrath, Brobeck Phleger and Harrison, San Diego, CA, for DepoTech Corporation, Edward L. Erickson, Sinil Kim, defendants.

## MEMORANDUM OPINION AND ORDER DISMISSING CASE WITH PREJUDICE

WHELAN, District Judge.

This matter comes before the Court on Defendants' motions to dismiss and to strike Plaintiffs' Corrected Second Amended Complaint and Plaintiffs' cross-motions to compel and to strike. This Court has jurisdiction pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331. For the reasons expressed below, the Court **DISMISSES** this action with prejudice and without leave to amend.

## I. *BACKGROUND*

### A. *OVERVIEW*

Plaintiffs represent a class of shareholders who purchased shares of Defendant DepoTech, Inc. ("DepoTech") between April 1, 1996 and December 18, 1997

("Class Period"). (CSAC ¶ 1.)[1] Plaintiffs contend that, during the Class Period, DepoTech and one of its directors made materially false and misleading statements concerning the efficacy of DepoTech's lead product. (*Id.* ¶¶ 46–79.)

DepoTech is a San Diego-based company that develops and manufactures pharmaceutical drug delivery products and whose stock was traded on the NASDAQ National Market System. (*Id.* ¶ 7(a).) Defendant Edward L. Erickson ("Erickson") served as president, chief executive officer and director of DepoTech during the Class Period. (*Id.* ¶ 7(b).) Defendant Sinil Kim ("Kim") served as DepoTech's vice president of advanced technology, chief scientific officer and director emeritus during the Class Period. (*Id.* ¶ 7(c).)

Plaintiffs accuse Defendants of artificially inflating the price of DepoTech stock by deceiving the investing public about the effectiveness of DepoTech's lead pharmaceutical product. (*Id.* ¶¶ 1–2.) Plaintiffs claim they sustained damages when the price of DepoTech shares dropped after a specialized oncologic committee of the Food and Drug Administration (FDA) declined to recommend approval of the company's lead product on December 18, 1997. (*Id.* ¶¶ 1–2, 5.)

### B. *DEPOFOAM AND DEPOCYT*

DepoTech develops and manufactures an injectable pharmaceutical drug delivery technology known as "DepoFoam." (*Id.* ¶¶ 3, 19.) DepoFoam consists of microscopic spherical particles with hundreds or thousands of chambers separated by a membrane. (IC ¶ 21.)[2] These chambers

---

1. All citations to "(CSAC ¶ ___)" refer to numbered paragraphs in Plaintiffs' Corrected Second Amended Complaint for Violations of the Securities Exchange Act of 1934 filed April 27, 2000. All citations to "(Defs.' RJN Ex. ___") refer to exhibits in Defendants Request for Judicial Notice filed June 12, 2000.

2. Citations to "(IC ¶ ___)" refer to numbered paragraphs in Plaintiffs' initial Complaint filed April 8, 1998. The Court may consider this document for the reasons stated in Part III.A, *infra.*

can encapsulate a wide spectrum of drugs and chemicals and release them, after injection into a patient, over an extended period of time. (*Id.*) DepoTech claims its DepoFoam technology enables the development of safe and effective pharmaceutical products by encapsulating existing drugs and chemicals within DepoFoam. (*Id.*) DepoTech also claims that DepoFoam encapsulated products provide significant advantages over a non-DepoFoam products, including enhanced safety, efficacy and quality of life. (CSAC ¶¶ 46, 48.)

During the Class Period, DepoTech's lead product was DepoCyt, a product consisting of a DepoFoam encapsulation of cytarabine, a generic anti-cancer drug. (*Id.* ¶ 20.) According to Plaintiffs, DepoCyt was DepoTech's only product in late stage clinical development and its only potential source of product revenues for the next several years. (*Id.*)

## C. NEOPLASTIC MENINGITIS AND CLINICAL TRIALS

Neoplastic meningitis ("NM") is the metastasis of cancer to the soft tissue membrane which surrounds the brain and spinal cord. (*Id.* ¶ 21.) The condition is invariably fatal with an average three month survival after diagnosis. (*Id.*) NM occurs in approximately 7,000 to 9,000 patients per year in the United States. (*Id.*) Most patients who suffer from NM develop the condition from metastasis from solid tumors. (*Id.*) Methotrexate ("MTX") is the standard chemotherapeutic agent used to treat NM from solid tumors. (*Id.*)

Beginning in April 1994, DepoTech commenced the pivotal clinical stage of a three-phase study designed to compare the effectiveness of DepoCyt with MTX for the treatment of NM from solid tumors. (CSAC ¶¶ 29, 34; Defs.' RJN Ex. G at 6.) The study originally consisted of 40 patients, half randomly assigned to treat-

ment with DepoCyt and the other half with MTX. (CSAC ¶ 34; Defs.' RJN Ex. G at 7.) The study was subject to regulation and constant supervision by the FDA. (CSAC ¶¶ 24–25, 27–28.)

During the Class Period, DepoTech and Erickson made a variety of statements to the press and in SEC registration statements concerning DepoFoam and DepoCyt's efficacy. According to Plaintiffs, Defendants misled the public by stating that DepoFoam could enhance the safety and efficacy of existing drugs, by declaring that DepoCyt offered quality of life benefits over competing NM treatments, by falsifying the interim results of clinical trial patients, and by opining that DepoCyt had "extremely promising" prospects for FDA approval. (*Id.* ¶¶ 46, 48–49, 51, 55, 60–61, 64, 66, 69, 75–78.)

The results of the DepoCyt study were subsequently revealed at a meeting of the Oncologic Drugs Advisory Committee ("ODAC") to the FDA that occurred on December 18, 1997, the last day of the Class Period. At that meeting, members of the ODAC panel opined that DepoCyt's clinical benefits did not offset dangerous toxicity side effects experienced by several patients. (*Id.* ¶¶ 5, 80, 82.) ODAC ultimately declined to recommend DepoCyt for FDA approval. (*Id.* ¶¶ 84, 87.) The price of DepoTech's common stock then plummeted from $13.00 to $3.38 per share. (*Id.* ¶ 2.) After the close of the Class Period, the FDA approved DepoCyt as a treatment for NM from non-Hodgkins lymphoma, and sales commenced shortly thereafter. (*Id.* ¶ 91.)

## D. THIS ACTION

On April 9, 1998 Plaintiffs commenced this class action securities case against Defendants DepoTech, Erickson and Kim alleging: (1) violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Rule

10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and (2) controlling person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Plaintiffs filed the currently-operative Corrected Second Amended Complaint on April 27, 2000. Defendants now move to dismiss this action pursuant to Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, 109 Stat. 743 (1995) ("Reform Act").

## II. *LEGAL STANDARD*

When ruling on a motion to dismiss, the district court must accept all material factual allegations as true and construe them in the light most favorable to the non-moving party. *See Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987); *North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir.1983). A district court may dismiss a complaint as a matter of law where the complaint lacks a cognizable legal theory, where it fails to allege sufficient facts alleged under a cognizable legal theory, or where it includes allegations establishing that the plaintiff has no legal claim. *See Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984); *Weisbuch v. County of Los Angeles*, 119 F.3d 778, 783 n. 1 (9th Cir. 1997). Legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *See Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981); *In re VeriFone Sec. Litig.*, 11 F.3d 865, 868 (9th Cir.1993) ("Conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim.").

## III. *DOCUMENTS PROPERLY CONSIDERED ON A MOTION TO DISMISS*

In connection with their motion to dismiss, Defendants filed several hundred pages of documents for the Court's consideration, including various DepoTech SEC filings, previous complaints and orders filed in this action, unpublished orders issued by other district courts, several DepoTech press releases, and various portions of the DepoCyt New Drug Application filed with the FDA. Plaintiffs move to strike some of these documents, arguing the Court may not consider them on a motion to dismiss.

A district court reviewing a motion to dismiss may consider the facts alleged in the complaint, documents properly attached to the complaint, and matters over which the Court may take judicial notice. *See Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1989). A court may also consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading[.]" *See Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir.1994). The court may consider the full text of those documents, even when the complaint quotes only selected portions. *See Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir.1997) (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1080 n. 1 (9th Cir.1995)). A district court may also consider documents whose authenticity is not contested, and upon which the plaintiff's complaint necessarily relies. *See Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998). However, a district court "*may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." *Schneider v. California Dept. of Corrections*, 151 F.3d 1194, 1197 n. 1 (9th Cir.1998) (emphasis in original).

## A. *PLEADINGS AND COURT ORDERS*

■ Defendants' Exhibits A through F consist of previous pleadings and court

orders filed in this action, and two unpublished district court orders from two unrelated securities fraud actions. Because these public documents are properly subject to judicial notice, the Court may consider them on a motion to dismiss. *See, e.g., Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1198 (9th Cir.1988) (holding that district court properly took judicial notice of district and appellate court proceedings in deciding motion to dismiss); *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986) (holding that district court may take judicial notice of its own files and the files of other cases). Plaintiffs make no specific objection to the Court's consideration of these documents.

### B. SEC FILINGS

■ Defendants' Exhibits G through K consist of various SEC filings, including DepoTech's Form 10–K filings for 1995–1996, DepoTech's Form S–1 Registration Statement filed on July 10, 1996, and Form 4 filings by Erickson and Kim. Plaintiffs either quoted, referred to, or relied heavily on these documents in drafting their Second Amended Complaint. *See In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir.1999) (upholding district court's consideration of SEC Forms on motion to dismiss where complaint generally referenced SEC filings and the plaintiffs obviously relied on them in forming their allegations); *see also Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991) (holding that district court may take judicial notice of, and consider, public disclosures required by law and actually filed with the SEC). Moreover, Plaintiffs make no specific objection to the Court's consideration of Defendants' SEC filings.

### C. DEPOTECH PRESS RELEASES

■ Exhibits L through O consist of four DepoTech press releases issued between June 1996 and November 1998. Plaintiffs specifically quote two of these press releases in their Second Amended Complaint, and make general reference to the company's press releases as a basis for their allegations. (*See* CSAC ¶¶ 55, 77, 95.) In addition, Plaintiffs offer no specific objection to any of DepoTech's press releases.

### D. RISK DISCLOSURE CHART

■ Exhibit P is a chart drafted by Defendants' counsel listing various risk disclosures DepoTech included in the aforementioned SEC filings and press releases. The Court may consider the chart because it is simply a collection of quotations from documents the Court may independently consider for the reasons expressed above.

### E. ODAC TRANSCRIPT

■ Defendants' Exhibit Q contains the 146–page transcript of the ODAC proceedings that took place on December 18, 1997, which ultimately led to the denial of DepoCyt's FDA application. Plaintiffs' Complaint repeatedly quotes and refers to the ODAC transcript. (*See* CSAC ¶¶ 62, 72, 82–83, 95.) Plaintiffs have all but conceded the propriety of considering this document in ruling on Defendants' motion to dismiss.

### F. NOTICE OF COMPLIANCE ISSUED BY CANADIAN AGENCY

■ Defendants' Exhibit S is a Notice of Compliance issued by a Canadian regulatory agency. The Notice indicates that the Canadian government approved DepoCyt for treating NM on November 17, 1999. The document is subject to judicial notice, and Plaintiffs make no attempt to dispute its authenticity. *See Bryant v. Carleson,* 444 F.2d 353, 357–58 (9th Cir. 1971) (taking judicial notice of orders and decisions made by other courts and administrative agencies); *County of Stanislaus*

*v. Pacific Gas & Elec. Co.*, No. CV–F–5866–OWW, 1995 WL 819150, at *8, 1995 U.S. Dist. LEXIS 21411, at *22 (E.D.Cal. Dec. 18, 1995) (taking judicial notice of decisions issued by a Canadian regulatory agency), *aff'd* 114 F.3d 858 (9th Cir.1997). Plaintiffs make no objection to the use of this public document.

### G. *DEPOCYT NM STUDY PROTO-COL DOCUMENTS*

■ Defendants' Exhibit R and R–1 through R–6 contain portions of the Depo-Cyt New Drug Application (NDA) filed with the FDA on April 28, 1997, correspondence between the DepoTech and FDA, and sections of the protocol for DepoCyt's clinical trials. Plaintiffs contend the Court should not consider these documents.

These documents do not fall within any of the categories of documents district courts can generally consider on a motion to dismiss. Although the NDA and protocol study were submitted to the FDA, they are not available to the public and not suitable for judicial notice. The Second Amended Complaint makes passing reference to the NDA, but does not discuss its contents in extensive detail. (*See* CSAC ¶¶ 22, 24, 92.) Plaintiffs do not have possession of the complete DepoCyt NDA or protocol study,[3] and thus could not have relied on those documents in forming the allegations in the Second Amended Complaint. Therefore, the Court GRANTS Plaintiffs' motion to strike as to Exhibits R and R–1 through R–6.

### IV. *PLAINTIFFS' MOTION TO COMPEL*

Plaintiffs contend that Defendants' Exhibit R consists of incomplete and misleading fragments of the 27–volume New Drug Application filed with the FDA on April 28,

1997. Plaintiffs seek an order compelling Defendants to furnish Plaintiffs with a complete copy of the New Drug Application. Defendants respond that Plaintiffs' motion violates the discovery stay imposed by the Reform Act.

Plaintiffs' motion fails for two reasons. First, the Reform Act provides that "all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u–4(b)(3)(B). Plaintiffs do not allege that their motion seeks to preserve evidence or prevent undue prejudice. Second, Plaintiffs' motion is largely moot in light of the Court's refusal to consider the contents of Exhibit R. The Court therefore **DENIES** Plaintiffs' motion to compel.

### V. *DEFENDANTS' MOTION TO STRIKE THE MAKUCH AFFIDAVIT*

Attached to Plaintiffs' Second Amended Complaint is a 14–page affidavit authored by Dr. Robert Makuch, a professor at the Yale University School of Medicine and head of the medical school's Division of Biostatistics. (CSAC, Decl. of Robert Makuch ("Makuch Decl.") ¶ 1.) Dr. Makuch provides expert testimony regarding the medical community and FDA's interpretation and evaluation of data generated by new drug clinical trials. Dr. Makuch also gives his opinion as to the materiality of Defendants' alleged misrepresentations. Defendants move to strike Dr. Makuch's attached affidavit because it violates Rule 10 of the Federal Rules of Civil Procedure,

---

**3.** Plaintiffs have filed a separate motion to compel seeking discovery of the entire NDA.

That motion is discussed in Part IV, *infra.*

and alternatively, because it offers only inadmissible speculation.

Rule 10(c) of the Federal Rules of Civil Procedure provides in pertinent part: "A copy of any written instrument which is an exhibit to a pleading is a part hereof for all purposes." Plaintiffs and Defendants dispute whether the Makuch affidavit qualifies as a "written instrument" within the meaning of Rule 10(c) such that it may properly be considered on a motion to dismiss.

██ A "written instrument" within the meaning of Rule 10(c) "is a document evidencing legal rights or duties or giving formal expression to a legal act or agreement, such as a deed, will, bond, lease, insurance policy or security agreement." *Murphy v. Cadillac Rubber & Plastics, Inc.,* 946 F.Supp. 1108, 1115 (W.D.N.Y. 1996) (citing *Black's Law Dictionary* 801, 1612 (6th ed.1990)). The documents that satisfy this definition "consist largely of documentary evidence, specifically, contracts, notes, and other writings on which a party's action or defense is based[.]" *Rose v. Bartle,* 871 F.2d 331, 339 n. 3 (3d Cir.1989) (internal quotations and alteration omitted). Here, Dr. Makuch's affidavit does not resemble any of the classes of documents that meet the definition of a "written instrument" under Rule 10(c). The affidavit represents a piece of evidentiary matter generated by a retained expert who had no contact with DepoTech and no involvement in the DepoCyt clinical trials. The affidavit contains Dr. Makuch's assessment of Defendants' public statements, but it does not form the basis of Plaintiff's claims.

The Court rejects Plaintiffs' reliance on *Branch v. Tunnell,* 14 F.3d 449 (9th Cir.1994), where the Ninth Circuit approved of the district court's consideration of an affidavit attached to a motion to dismiss. The affidavit in *Branch,* which plaintiff made specific reference to in his complaint, was used by the defendants to obtain a search warrant of the plaintiff's home and business. *Id.* at 450. The plaintiff claimed the warrant affidavit contained deliberately false statements, rendering the resulting search of his premises a violation of his rights under the Fourth Amendment. *Id.* at 451–52. Thus, the false statements in the search warrant affidavit formed the basis of plaintiff's civil rights claim, much the same way misrepresentations in an SEC filing can give rise to a securities fraud claim. Dr. Makuch's affidavit, on the other hand, clearly does not form the basis of Plaintiffs' securities fraud claims; it is merely a piece of evidentiary matter that does not exist independently of the complaint.

Plaintiffs also rely heavily on the Seventh Circuit's decision in *Schnell v. City of Chicago,* 407 F.2d 1084 (7th Cir.1969), *overruled on other grounds City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973) for the proposition that an affidavit attached to a complaint is deemed part of the complaint for all purposes under Rule 10(c). However, *Schnell* devoted only one sentence to analysis of the issue, and apparently assumed that any written document attached to a complaint qualifies as a "written instrument" under Rule 10(c). *Id.* at 1085.[4]

This Court declines to follow *Schnell* and instead adopts the holding of the

---

4. New York adopted a procedure almost identical to Rule 10(c): "A copy of *any writing* which is attached to a pleading is a part thereof for all purposes." N.Y. C.P.L.R. 3014 (McKinney 2000) (emphasis added). The New York rule tracks Rule 10( c) with the exception that it broadly governs "any writing," and not simply a "written instrument." The differences between the two rules support Defendants' contention that "written instrument" does not encompass any document attached to a pleading.

Third Circuit's more recent decision in *Rose v. Bartle*, 871 F.2d 331 (3d Cir.1989). *Rose* involved a consolidated appeal in three separate civil cases filed by three plaintiffs. One plaintiff filed an affidavit in opposition to defendants' motion to dismiss while the other two filed the affidavit as an exhibit to their amended complaints. *Id.* at 339–40 n. 3. The Third Circuit concluded that the district court could not consider the affidavits without converting the defendants' motions to dismiss into motions for summary judgment. *Id.* The court reasoned that considering an affidavit attached to a complaint would not only draw a nonsensical distinction between an affidavit filed with a pleading and an affidavit filed with a motion to dismiss, but would also "blur the distinction between summary judgment and dismissal for failure to state a claim upon which relief can be granted." *Id.*

The Third Circuit's concerns with preserving the procedural distinctions between a motion to dismiss and a motion for summary judgment carry additional weight in the context of federal securities litigation and when the affidavit comes from a purported expert. Considering an expert affidavit on a motion to dismiss, whether attached to a motion to dismiss or as an exhibit the plaintiff's complaint, forces a district court to confront a myriad of complex evidentiary issues not generally capable of resolution at the pleading stage. For example, the Supreme Court has held that Rule 702 of the Federal Rules of Evidence assigns to the district court the role of "gatekeeper" with respect to expert testimony, requiring the court to ensure that the testimony is reliable and would assist the trier of fact. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The factors a district court may consider in making this determination include: (1) the objective testability of the expert's technique or theory, (2) whether the technique or theory had been subjected to peer review and publication, (3) the error rate for the technique or theory, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been accepted in the community. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

In this case, a complete evaluation of the relevant factors would likely require a deposition of Dr. Makuch and a subsequent *Daubert* hearing to determine the admissibility of his affidavit. These additional proceedings would be improper at the pleading stage of any civil case, and would likely run afoul of the discovery stay imposed by the Reform Act. *See* 15 U.S.C. § 78u–4(b)(3)(B) (mandating stay of discovery and other proceedings in private securities actions during pendency of any motion to dismiss); *see generally Medhekar v. United States District Court*, 99 F.3d 325, 326–27 (9th Cir.1996) (per curiam) (discussing the Reform Act's discovery stay). In addition, the contents of an expert affidavit are susceptible to a panoply of evidentiary and procedural challenges not generally applicable to allegations in a complaint, including objections based on countless federal evidentiary rules governing admissibility and compliance with the expert disclosure and report requirements of Rule 26(a). In sum, considering an expert affidavit would so complicate the procedural posture of a motion to dismiss that it would become virtually indistinguishable from a motion for summary judgment.

The Court further questions whether any good reason exists for a plaintiff to attach an expert affidavit as an exhibit to a complaint. The inclusion of such an affidavit in no way relieves a plaintiff of its burden to comply with the Reform Act and the applicable provisions of the Federal

Rules of Civil Procedure. Because the Court must generally assume the truth of all material factual allegations in a complaint, averments in an expert affidavit carry no additional probative weight merely because they appear within an affidavit rather than numbered paragraphs of the complaint. A securities fraud complaint must, regardless of its form and attachments, provide the factual specificity required by the Reform Act and Rule 9(b). Conclusory allegations and speculation carry no additional weight merely because a plaintiff placed them within the affidavit of a retained expert.

A better approach might be to include the expert's nonconclusory assertions within specific paragraphs in the complaint. This would reduce needless redundancy and simplify pleadings in federal securities cases. Indeed, Plaintiffs replicated almost all of the relevant portions of Dr. Makuch's affidavit in several paragraphs of the Second Amended Complaint. (*See, e.g.,* CSAC ¶¶ 25, 29–30, 89; Defs.' Motion to Strike at 3–4 n. 1 (listing paragraphs in the Second Amended Complaint that repeat portions of Dr. Makuch's affidavit).)

The Court holds that Dr. Makuch's affidavit does not qualify as a "written instrument" within the meaning of Rule 10(c), and therefore **GRANTS** Defendants' motion to strike the Makuch affidavit attached to the Second Amended Complaint.[5] However, the Court **DENIES** Defendants' motion to the extent it seeks an order striking those portions in the

Second Amended Complaint that were derived from the Makuch affidavit.

## VI. THE MERITS OF PLAINTIFFS' SECTION 10(B) CLAIM

Plaintiffs accuse Defendants of making a variety of false and misleading statements concerning the efficacy of DepoCyt for treating NM.

To state a claim under Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, Plaintiffs must allege (1) a misstatement or omission of material fact, (2) made with scienter, (3) on which the Plaintiffs relied, which (4) proximately caused injury. *See, e.g., Binder v. Gillespie,* 184 F.3d 1059, 1063 (9th Cir.1999). Defendants claim that Plaintiffs have failed to properly plead two of these elements: (1) a misstatement or omission of material fact and (2) scienter.

### 1. MISSTATEMENT OR OMISSION OF MATERIAL FACT

Under the Private Securities Litigation Reform Act of 1995 ("Reform Act"), complaints alleging securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). As noted by the First Circuit, this provision codifies a pleading standard similar to the particular-

---

**5.** The Court acknowledges that it could grant Plaintiffs leave to amend to file a Third Amended Complaint that eliminates Dr. Makuch's affidavit. *See, e.g., Foltz v. Moore McCormack Lines,* 189 F.2d 537, 539 (2d Cir. 1951) (holding that violation of Rule 10(b) did not justify dismissal without leave to amend where plaintiff could remedy pleading deficiency through amendment). Because Plaintiffs repeated most of the substance of the

affidavit in the Second Amended Complaint, however, striking the Makuch affidavit does not materially affect the Second Amended Complaint's compliance with the Reform Act and Rule 9(b). In addition, the Court has reviewed the Makuch affidavit and finds that its contents, even if considered, would have not have brought the Second Amended Complaint into compliance with the Reform Act or Rule 9(b).

ity requirements imposed by Rule 9(b) of the Federal Rules of Civil Procedure. *See, e.g., Greebel v. FTP Software, Inc.,* 194 F.3d 185, 193 (1st Cir.1999). Under Rule 9(b), a complaint alleging fraud must "state precisely the time, place, and nature of the misleading statements, misrepresentations, or specific acts of fraud." *Kaplan v. Rose,* 49 F.3d 1363, 1370 (9th Cir.1994). In addition, the complaint must set forth an explanation as to why the statement was false and misleading when made. *See In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399, 1404 (9th Cir.1996); *In re GlenFed Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994) (en banc). For example, a complaint can explain why a statement was false or misleading when made by identifying either (1) inconsistent contemporaneous statements or (2) inconsistent contemporaneous information (such as an internal report) that was made by or was available to the defendants. *Id.* at 1549. A complaint may not, however, plead fraud by hindsight and simply "point[ ] to later inconsistent statements or conditions." *Id.* at 1548.

 Plaintiffs attack a variety of statements made during the 20–month Class Period, including (1) optimistic statements about the company's DepoFoam technology and DepoCyt product; (2) public statements reporting interim results of ongoing DepoCyt clinical trials; (3) statements comparing the survival of patients treated with DepoCyt with patients treated with MTX; and (4) optimistic statements concerning DepoCyt's prospects for FDA approval.[6]

## A. *OPTIMISTIC STATEMENTS ABOUT DEPOFOAM AND DE-POCYT*

 Plaintiffs first attack a series of optimistic statements by Defendants Depo-Tech and Erickson concerning the Depo-Foam technology and DepoCyt, the company's lead product. (CSAC ¶¶ 46–50, 60–61, 66.) Specifically, on April 1, 1996 (the beginning of the Class Period), DepoTech filed its Form 10–K for the year ended December 31, 1995. (*Id.* ¶ 46.) In that document, the company stated:

• that DepoTech "believes that proprietary DepoFoam formulations will add additional value to [existing] drugs by potentially increasing their level of efficacy, reducing their toxicity and side effects, and expanding the indications they address." (Id.¶ 46.)

• that DepoFoam can "[e]nhance the safety and efficacy, ... by decreasing the initial peak concentrations of drug associated with toxicity, while maintaining levels of drug at therapeutic, sub-toxic concentrations for an extended period of time." (*Id.* ¶ 48.)

• that DepoFoam "may allow such drugs to be used in indications where they cannot currently be used because of the limitations of current delivery methods." (*Id.* ¶ 49.)

• that DepoTech "believes DepoCyt will be used to treat [NM from solid tumors] even through the active ingredient of DepoCyt, cytarabine, is currently not labeled for these indications." (*Id.*)

---

6. Plaintiffs also identify a number of statements that occurred in 1995. (*See* CSAC ¶¶ 26–45.) Defendants urge the Court to ignore these statements because they occurred before the start of the Class Period.

Statements occurring before the class period are not actionable under Section 10(b) or Rule 10b–5. *See, e.g., In re International Bus. Mach. Corp. Sec. Litig.,* 163 F.3d 102, 107 (2d

Cir.1998) (holding that statement made one day prior to start of class period was not actionable) (citing *In re Clearly Canadian Secs. Litig.,* 875 F.Supp. 1410, 1420 (N.D.Cal. 1995)). However, statements made shortly before the class period may have evidentiary relevance to the issue of scienter and falsity because they may provide insight into what the defendant knew during the class period.

Plaintiffs also challenge several statements made by Defendant Erickson to the press between June and July 1996. Specifically:

- The June 26, 1996 issue of *BIO-WORLD Today* accurately reported Defendant Erickson stating that DepoCyt was more desirable than MTX because it is injected only once every two weeks rather than two to three times per week and offers quality-of-life benefits. (*Id.* ¶ 60.)

- On July 1, 1996 Defendant Erickson was interviewed by *Investor's Business Daily*. During that interview, Erickson stated that DepoCyt offers "greater efficacy, better quality of life for the patient and possible economic benefits." (*Id.* ¶ 61.)

Finally, in a July 10, 1996 SEC Registration Statement DepoTech stated that "DepoFoam's sustained-release characteristics allow drugs to perform more safely and effectively," and that "DepoFoam may improve the ratio of therapeutic effect to toxicity." (*Id.* ¶ 66.)

Plaintiffs claim these statements were materially misleading when made because the evidence available to Defendants established that DepoCyt did not offer any significant advantages over competing forms of treatment. Specifically, Plaintiffs rely on the results of a 1995 controlled study of DepoCyt, the only DepoFoam formulation in existence at that time, which revealed that DepoCyt patients experienced a significantly higher number of adverse effects than patients treated with a control drug. (*Id.* ¶¶ 47, 50.) Plaintiffs also contend that Defendants' statements concerning DepoCyt's alleged quality of life benefits were materially misleading when made because, as revealed at the December 1997 ODAC meeting, more De-

poCyt patients experienced toxicity problems and other serious adverse effects than patients treated with MTX. (*Id.* ¶ 62.)

Plaintiffs have failed to establish that any of these optimistic statements regarding DepoFoam and DepoCyt were false and misleading when made. First, Plaintiffs improperly ignore numerous contemporaneous facts that provided ample factual support for Defendants' optimistic statements. For example, Plaintiffs cannot dispute that the 1995 clinical trials suggested not only that DepoCyt had a materially higher response rate than MTX, but that patients treated with DepoCyt lived much longer than patients treated with MTX. (*See, e.g.*, Defs.' RJN Ex. G at 7 (summarizing August 1995 interim results of clinical trials showing significantly increased response rates and survival times for DepoCyt patients).) Defendants also had a reasonable basis to believe that DepoCyt offered quality of life and economic benefits to patients. As Plaintiffs stated in their earlier pleadings, administering therapeutic drugs to patients suffering from solid tumor NM generally requires either costly brain implants or a series of extremely painful spinal injections. (*See* IC ¶ 23.) DepoCyt patients did not undergo surgery, and received only a fraction of the spinal injections administered to MTX patients. (*See, e.g.*, CSAC ¶ 60; Defs.' RJN Ex. G at 7). Indeed, one physician who testified at the ODAC meeting went as far to say: "It is hard to rationalize putting an 18–gauge needle in the back of a cancer patient twice a week when you know that you have something potentially that could be done every two weeks." (Defs.' RJN Ex. Q at 36.)[7] Defendants clearly had a rea-

---

7. The other results of the December 1997 ODAC meeting further undermine Plaintiffs' contention that DepoCyt diminished quality of life. The FDA presenter at the ODAC meeting indicated that a questionnaire distributed to patients in both treatment groups revealed no significant difference in quality of life. (*See* Defs.' RJN Ex. Q at 23, 82.)

sonable basis for their optimistic statements concerning DepoCyt's efficacy, quality of life and economic benefits.

Second, Plaintiffs' contention that toxicity problems rendered DepoFoam and DepoCyt irremediably flawed lacks support in the record. The FDA presenter at the ODAC meeting acknowledged that more DepoCyt patients experienced adverse toxicity effects than patients treated with MTX, but explained that DepoCyt patients received many more cycles of treatment than MTX due in part to the DepoCyt patients' longer survival time. The FDA presenter emphasized that analyzing toxicity on a "per cycle" rather than a "per patient" basis eliminated any significant toxicity difference between the two drugs. (*See* Defs.' RJN Ex. Q at 30 (FDA presenter stated that adjusting toxicity data for per-cycle treatment causes the toxicity difference between DepoCyt and MTX to "narrow considerably."), *id.* at 31 (FDA presenter stated that there was "essentially no difference" between DepoCyt and MTX in terms of incidents of serious chemical anachnoiditis), *id.* at 82–83 (FDA presenter stating: "[O]n a per-patient basis, the difference [in toxicity] between treatment groups was statistically significant... On a per-cycle basis, this was not the case.").)

Plaintiffs respond that this per cycle analysis does not properly capture the toxicity of DepoCyt compared to MTX because, among other reasons, it fails to take into account the increased incidents of chemical anachnoiditis suffered by DepoCyt patients and the possibility that some patients prematurely ended treatment. (CSAC ¶ 63.) The Court finds this argument amounts to little more than hindsight-based criticism and speculation. Although Plaintiffs may have established a legitimate difference in opinion as to the proper statistical analysis, they have hardly stated a securities fraud claim. *See In*

*re Medimmune, Inc. Sec. Litig.,* 873 F.Supp. 953, 966 (D.Md.1995) (differences of opinion among medical researchers as to the proper interpretation of test results does not by itself demonstrate fraud); *Padnes v. Scios Nová, Inc.,* No. C 95–1693 MHP, 1996 WL 539711, at *5 (N.D.Cal. Sept.18, 1996) ("With the advantage of hindsight, defendants' judgment as to which information to disclose is subject to challenge; however, this does not amount to [fraud].").

In addition, Plaintiffs do not offer any specific challenge to Defendants' public statement that DepoFoam could "decreas[e] the initial peak concentrations of drug associated with toxicity, while maintaining levels of drug at therapeutic, subtoxic concentrations for an extended period of time." (CSAC ¶ 48.) This explanation appears consistent with the sustained-release characteristics of the DepoFoam technology; because DepoFoam gradually releases therapeutic drugs over time, it can continuously maintain effective concentrations at sub-toxic levels. Plaintiffs allege no facts suggesting this statement was false. Finally, Plaintiffs offer no explanation as to why, despite its allegedly serious toxicity problems, the FDA subsequently approved DepoCyt for treatment of non-Hodgkins lymphoma and the Canadian government approved the drug for treatment of NM from lymphoma and solid tumors. (*Id.* ¶¶ 3, 89, 91; Defs.' RJN Ex. S.) In sum, Plaintiffs have failed to allege facts suggesting that DepoCyt's toxicity was so severe that it made Defendants' optimistic statements about DepoFoam and DepoCyt false or materially misleading when made.

Third, several of the optimistic statements challenged by Plaintiffs relate to the DepoFoam technology generally, not DepoCyt. (*See* CSAC ¶¶ 46, 48–49, 66.) Although DepoCyt was the only DepoFoam

product in late stage clinical trials at the time, it represented only one possible formulation of DepoFoam under DepoTech's development. For example, Defendants disclosed plans to develop other Depo-Foam encapsulated products, including DepoMorphine (for treatment of acute post-operative pain), DepoAmikacin (for treatment of bacterial infections), and various DepoFoam encapsulated proteins. (*See* Defs.' RJN Ex. G at 6–9; Defs.' RJN Ex. H at 2.) Plaintiffs do not allege that the toxicity problems that allegedly plagued DepoCyt would carry over to any other DepoFoam formulation.[8] Plaintiffs provide no factual basis to infer that the alleged toxicity problems associated with DepoCyt undermined Defendants' optimistic statements about the underlying DepoFoam technology.

Plaintiffs have failed to establish that Defendants' optimistic statements about DepoFoam and DepoCyt were false or misleading when made. Plaintiffs have done nothing more than establish that, as with almost any experimental drug designed to treat serious cancer, DepoCyt had its advantages and its disadvantages. Plaintiffs' hindsight-driven reassessment of these advantages and disadvantages, however, does not establish that any of Defendants' tentative and optimistic statements were false or misleading when made. Because Defendants clearly had a reasonable basis for their statements concerning DepoFoam and DepoCyt, the Court **DISMISSES WITH PREJUDICE** paragraphs 47–50, 60–63 and 66.

**8.** In fact, the Second Amended Complaint acknowledges that the FDA subsequently approved DepoCyt for treatment of NM from lymphoma. (CSAC ¶¶ 89, 91.) Plaintiffs downplay this development with two explanations: (1) "the toxicity of a drug may vary depending on the condition to be treated," and (2) "cytarabine, DepoCyt's active ingredient, is used as a treatment for lymphoma, but

## B. *STATEMENTS CONCERNING INTERIM CLINICAL TRIAL RESULTS*

■ During the Class Period, Depo-Tech reported the interim results of the clinical study that compared DepoCyt with MTX for treating solid tumor NM. Plaintiffs allege DepoTech falsified these interim results to inflate investor perception regarding DepoCyt's effectiveness. Defendants counter that their publicly-reported interim results contained no false or misleading statements.

DepoTech's 1995 Form 10–K filed with the SEC in April 1996 summarized interim results previously obtained from August 1995. In that document, DepoTech stated that "the primary endpoint of the [NM Study] is cytologic response (clearing of cancer cells from the CSF)," and that "[t]he response rate [for the first 15 evaluable] receiving DepoCyt was 47% compared to 6% for those receiving [MTX]." (CSAC ¶ 51; Defs.' RJN Ex. G at 7.) Approximately seven weeks later, on June 25, 1996 DepoTech issued a press release that included updated interim results:

The response rate was a primary endpoint of a multicenter, controlled, non-blinded trial of DepoCyt in which 61 patients were randomized to treatment either with DepoCyt or methotrexate, a generic chemotherapy agent that is the current standard of care for NM arising from solid tumors. Fifty-four of these patients were evaluable for the analysis of response to therapy. Response in this study was defined as the absence of

not for solid tumors." (CSAC ¶ 89.) Both of these explanations, however, undercut Plaintiffs' contention that Defendants lied about the potential advantages of the underlying DepoFoam technology. They suggest that DepoCyt's toxicity problems were either limited to NM from solid tumors, or caused by problems with the drug's active ingredient.

malignant cells in two consecutive samples of cerebrospinal fluid taken from patients and lack of disease progression as assessed through neurological evaluation. Of the 25 evaluable patients treated with DepoCyt, 36 percent [9 patients] showed a complete response versus 17 percent of 29 evaluable patients treated with methotrexate.

(CSAC ¶ 55; Defs.' RJN Ex. L.) Defendants repeated these representations in a prospectus released approximately two weeks later. (CSAC ¶ 64; Defs.' RJN Ex. H at 2, 22, 27–28.)

Plaintiffs claim these representations were materially false or misleading when made because the number of patients DepoCyt that achieved a "response" as defined by the protocol for the NM study never came close to 36%. Plaintiffs note that in September 1993 DepoTech and the FDA agreed that a patient would not achieve a "complete response" for purposes of the NM study unless: (1) a test of a patient's cerebrospinal fluid taken at day 29 after the start of treatment showed negative for malignant or suspicious cells from a site previously tested for positive, and no worsening of neurological symptoms; and (2) a second test performed approximately 32 days after the start of treatment showed negative for malignant or suspicious cells at all previously positive cites, and no worsening of neurological symptoms. (*Id.* ¶ 27.) As revealed during the December 1997 ODAC meeting, only three evaluable DepoCyt patients (12%) ever achieved a "response" under the original protocol definition. (*Id.* ¶¶ 54, 56, 65.)

Plaintiffs therefore accuse Defendants of either inflating the response rates they publicly reported in August through July 1996, or misrepresenting the definition of the primary endpoint of the study. Finally, Plaintiffs claim that DepoTech falsely stated that there were 25 evaluable DepoCyt patients when, in fact, there were only 22. (*Id.* ¶¶ 57–58.)

The Court finds these allegations meritless for several reasons. First, none of DepoTech's public statements reported a response rate *based on the response definition in the original study protocol.* The company's 1995 10–K, for example, repeated August 1995 interim clinical results indicating that 47% of evaluable DepoCyt patients achieved a cytologic response, which DepoTech contemporaneously described as the "clearing of cancer cells from the CSF[.]" (CSAC ¶ 51.) Plaintiffs do not dispute that 47% of evaluable DepoCyt patients achieved clearing of cancer cells from their cerebrospinal fluid. Similarly, DepoTech's June 1996 press release defined "response" (including the primary and secondary endpoints) as "the absence of malignant cells in two consecutive sample of cerebrospinal fluid ... and lack of disease progression as assessed through neurological evaluation." (*Id.* ¶¶ 55, 64.) DepoTech stated that 36% of evaluable DepoCyt patients achieved a response based on that definition, and Plaintiffs do not dispute the accuracy of that statistic.[9] None of DepoTech's public statements proclaimed that 36% of evaluable DepoCyt patients achieved "response" based on the definition set forth in the original study

---

9. Notably, Plaintiffs' earlier First Amended Complaint specifically alleged that only three DepoCyt patients achieved the absence of malignant cells in two consecutive samples of cerebrospinal fluid. Defendants responded by submitting, in connection with their previous motion to dismiss, cytology listings for DepoCyt patients indicating that at least nine patients had, in fact, achieved two or more consecutive negative cytologies. (*See* Defs.' RJN Ex. R–6.) Although the Court has not relied on the DepoCyt cytology listings in ruling on this motion, these documents apparently induced Plaintiffs to abandon their earlier, more compelling, theory of fraud and rely instead on the undisclosed original protocol definition.

protocol. Plaintiffs' attempt to manufacture falsity by relying on a response definition never publicly disclosed or relied upon by DepoTech is not well-taken. Moreover, the ODAC panel heard testimony from the FDA presenter acknowledging that at least eight DepoCyt patients had achieved "response." (*See* Defs.' RJN Ex. Q at 79, *id.* at 20–21.) Plaintiffs have failed to establish any inaccuracies in DepoTech's interim results.

Second, Plaintiffs' related argument that Defendants lied about the definition of "response" also fails. As Plaintiffs acknowledge in their opposition memorandum, DepoTech and the FDA jointly agreed to abandon the original response criteria and employ a more liberal definition that did not require a confirmatory negative within three days after the first negative cytology. (*See* Pl.'s Opp'n at 18.) As noted by the FDA presenter at the ODAC meeting, this modified definition included patients "who had a negative cytology, but didn't have a confirmatory cytology within the time frames that were defined." (Defs.' RJN Ex. Q at 77.) Plaintiffs attempt to cast suspicion on the agreement between the FDA and DepoTech by calling it a "secret" or "concealed" agreement. (*See* Pl.'s Opp'n at 18, 31.) However, the ODAC transcript reveals that the collaboration between DepoTech and the FDA reflected the evolving requirements of the NM clinical trials. Nothing in the Second Amended Complaint, the ODAC transcript, or any other documents before this Court suggests that DepoTech made any misrepresentation to the FDA or the ODAC panel.

Plaintiffs next argue that although the DepoCyt responders discussed at the ODAC meeting may have had cytology tests consistent with "response," nothing in the record indicates that they also experienced the lack of clinical disease progression. However, Plaintiffs cannot dispute that, regardless of the specific criteria employed, "response" always included the secondary endpoint of lack of disease progression. The FDA's acknowledgment that at least eight DepoCyt patients had a "response" necessarily indicates that those patients achieved not only the requisite negative cytology tests, but also the lack of clinical disease progression. Nothing in the Second Amended Complaint, aside from Plaintiffs' unsupported speculation and conjecture, suggests otherwise.

Third, Plaintiffs have failed to establish that Defendants' statements in June and July 1996 that there were "25 evaluable patients treated with DepoCyt." were false or misleading when made. (CSAC ¶ 55.) Plaintiffs rely on a later representation by a DepoTech representative at the ODAC meeting indicating that there were 22 evaluable patients in the DepoCyt group. (*Id.* ¶ 57.) However, "[t]he fact that an allegedly false statement and a later statement are different does not necessarily amount to an explanation as to why the earlier statement was false." *GlenFed,* 42 F.3d at 1549. Much occurred in the *18 months* that separated the issuance of DepoTech's June 1996 press release and the ODAC meeting in December 1997, including the data cutoff for the NM clinical trials, further statistical analysis of clinical data, and the filing of the complete New Drug Application with the FDA. Nothing in the Second Amended Complaint negates the reasonable inference that the removal of evaluable patients from the DepoCyt group resulted from subsequent statistical refinements of the clinical data. In any event, Plaintiffs plead no facts suggesting that, *in June 1996,* the clinical data included fewer than 25 evaluable DepoCyt patients.[10]

---

10. In October 1996, for example, DepoTech issued a press release disclosing 24 evaluable

DepoCyt patients, one less than publicly re-

The Court holds that Plaintiffs have failed to demonstrate that Defendants' statements concerning interim results of the NM clinical study were false or misleading when made. Accordingly, the Court **DISMISSES WITH PREJUDICE** paragraphs 51–58 and 64–65.

## C. *STATEMENTS CONCERNING DEPOCYT SURVIVAL TIME*

■ During the Class Period, Defendants publicly stated that patients treated with DepoCyt in the NM clinical studies had significantly longer survival than patients treated with MTX. Plaintiffs claim those statements were false and/or misleading when made.

To better understand Plaintiffs' allegations with respect to survival, the Court will provide a brief background. The NM clinical trials described above had a total of 61 enrolled patients randomized to treatment with DepoCyt and MTX; of those 61, 31 patients received DepoCyt and 30 received MTX. (Defs.' RJN Ex. Q at 19–20.) The study protocol specified two groups of patients: an "intent-to-treat" group that included all 61 patients enrolled in the study, and an "evaluable" subset of the intent-to-treat group. A patient could qualify as "evaluable" if, among other things, he or she received the study drug and underwent sufficient follow-up tests to determine a complete response. (*Id.* at 19.) By the time of the December 1997 ODAC meeting, 10 of the 61 patients enrolled in the study did not qualify as evaluable. Specifically, 22 of 31 DepoCyt patients qualified as evaluable, while 29 of 30 MTX patients qualified as evaluable. (*Id.*

at 20.) The DepoCyt group, therefore, lost nine evaluable patients while the MTX group lost only one.

Plaintiffs attack an October 21, 1996 DepoTech press release entitled, "New Drug Delivery Technology Enhances Effect of Cancer Drug." (CSAC ¶ 69.) The press release made important comparisons between the survival of DepoCyt and MTX patients, proclaiming:

Of 24 evaluable patients treated with DepoCyt, the median survival was 168 days compared to 87 days from 29 evaluable patients treated with the control drug, methotrexate (MTX). These 53 patients were evaluable for the survival analysis based on prospectively defined criteria. For all solid tumor patients, mean time to NM disease progression as measured by neurological examination or death from any cause was 108 for those receiving DepoCyt compared to 48 days for those receiving MTX.

(*Id.*) Notably, Plaintiffs do not attack the accuracy of these survival statistics; they do not dispute DepoTech's claim that the median survival for evaluable DepoCyt patients exceeded the survival for evaluable MTX patients by 81 days, and they do not dispute that there were 24 evaluable DepoCyt patients in October 1996.[11]

Rather, Plaintiffs' offer two arguments attacking the press release's focus on "evaluable" patients. First, Plaintiffs disagree with Defendants' statement that the 53 evaluable NM patients "were evaluable for the survival analysis based on prospectively defined criteria[.]" Plaintiffs claim this statement was false when made because

---

ported in June and July 1996. (*See* CSAC ¶ 69; Defs.' RJN Ex. M.) For reasons not clear from the record, Plaintiffs make no challenge to this statement.

**11.** As noted in the preceding section of this Order, *see infra* Part VI.1.B, DepoTech stated during the ODAC meeting that there were

only 22 evaluable DepoCyt patients. (*See* Defs.' RJN Ex. Q at 20.) DepoTech's October 1996 press release, however, indicated that there were 24 evaluable DepoCyt patients. The Court notes that Plaintiffs do not claim that the disclosure of 24 patients in October 1996 was false or misleading when made.

the NM protocol did not include any prospective criteria for the survival analysis, and required Defendants to analyze survival for all patients enrolled in the study. (*Id.* ¶ 70.) Second, Plaintiffs claim that DepoTech should not have limited the survival analysis to "evaluable" patients, and instead should have analyzed and reported survival for all patients enrolled in the study. Plaintiffs emphasize that the difference in survival between DepoCyt and MTX narrows considerably when all enrolled patients were taken into account. In fact, the median survival time of *all* 31 DepoCyt patients enrolled in the study was only 107 days—significantly shorter than the 168 day median survival reported for the 22 evaluable DepoCyt patients. (*Id.* ¶ 72.)

The Court finds both arguments wholly without merit. Plaintiffs' first argument relies on a tortured reading of a single sentence from the press release. Read in the context of the surrounding paragraph, the sentence "[t]hese 53 patients were evaluable for the survival analysis based on prospectively defined criteria" makes two assertions: (1) that the 53 patients included in the survival analysis were evaluable, and (2) that evaluability was based on prospectively defined criteria. Plaintiffs do not dispute either of these facts, nor could they. (*See* Defs.' RJN Ex. Q at 42 ("Both the intent-to-treat population and the evaluable population were prospectively defined in the protocol at the time it was written.").) The October 1996 press release did not make any false or misleading statements about the contents or requirements of the study protocol.

Plaintiffs' second argument is more complex, but equally flawed. Plaintiffs argue that Defendants should have published survival comparisons between DepoCyt and MTX for all patients enrolled in the study because including only evaluable patients improperly "excluded patients sim-

ply because they refused to have cerebrospinal fluid drawn for the CSF tests," which "has nothing to do with the drug's effect on survival." (CSAC ¶ 71.) The Court finds this argument wholly speculative. Plaintiffs do not offer any specific explanation as to why any of the nine DepoCyt patients did not achieve evaluability. In fact, *Plaintiffs do not allege that DepoTech excluded any DepoCyt patient merely because a patient refused to undergo CSF tests.* In essence, Plaintiffs criticize DepoTech for potentially excluding any patient who refused CSF tests, but allege no facts suggesting that any such patient was ever excluded. Moreover, a patient's refusal to undergo CSF tests is only one possible situation where the patient would not qualify as evaluable. For example, patients who did not receive DepoCyt or who died a few days into the study would not qualify as evaluable.

In addition, Plaintiffs allege no facts suggesting that Defendants manipulated the evaluable group to enhance DepoCyt's survival. For example, one witness told the ODAC panel that two DepoCyt patients dropped out of the study before receiving any dosage of DepoCyt, and were therefore not evaluable. (*See* Defs.' RJN Ex. Q at 43.) That witness explained that the greater number of DepoCyt patients excluded from the evaluable population resulted from chance. (*Id.* at 42.) In fact, the lymphoma and leukemia patient groups in the DepoCyt study experienced the reverse phenomenon—the MTX group had several patients who did not qualify as evaluable, but no dropouts from the DepoCyt group. (*Id.* at 43.)

Plaintiffs' attacks on DepoTech's survival representations depend on hindsight and speculation. Because Plaintiffs have failed to comply with the Reform Act of Rule 9(b) as to these representations, the Court

DISMISSES WITH PREJUDICE paragraphs 68–72.

### D. STATEMENTS CONCERNING THE LIKELIHOOD OF DEPOCYT OBTAINING FDA APPROVAL

Finally, Plaintiffs challenge optimistic statements by two securities analysts about DepoCyt's prospects for FDA approval. The statements included:

• An article in the May 1, 1997 issue of *Bioworld Today* repeated the opinions of two securities analysts, one from UBS Securities and the other from Vector Securities. (*See* CSAC ¶ 77.) The UBS Securities analyst described the DepoCyt clinical data as "spectacular" and opined that "[i]f there was ever a sure thing at the FDA, this is it." (*Id.*) The Vector Securities analyst made similar statements, characterizing FDA approval of DepoCyt as "a pretty easy decision." (*Id.*)

• An article in the July 8, 1997 *San Diego Union Tribune* quoted Defendant Erickson stating that DepoCyt had "extremely promising" prospects for FDA approval by the end of the year. (*Id.* ¶ 78.)

Plaintiffs contend these statements were false and/or misleading when made because DepoCyt had marginal efficacy and a high rate of adverse effects compared to MTX, rendering FDA approval unlikely. (*Id.* ¶ 79.)

The Court finds these contentions meritless. First, Plaintiffs have failed to adequately plead the statements by the two securities analysts. Under Section 10(b) and Rule 10b–5, a defendant may not be held liable for statements by a third party securities analyst unless the defendant placed its imprimatur, express or implied, on the analyst's statements. *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 934 (9th Cir.1996); *Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1349 (S.D.Cal.1998). At minimum, the plaintiff must show (1) that a corporate insider provided misleading information to a third-party analyst (2) who, relying on this information, prepared a report (3) that the insider endorsed or approved. *See Stack v. Lobo*, 903 F.Supp. 1361, 1372 (N.D.Cal. 1995). The plaintiff must also plead these facts with the specificity required by Rule 9(b). *See Syntex*, 95 F.3d at 934. Here, Plaintiffs do not allege that Defendants had *any* contact with the securities analysts at UBS or Vector Securities, or that Defendants had any involvement in the preparation of the analysts' opinions.

Second, Plaintiffs have failed to show that Defendant Erickson's opinion that DepoCyt had "extremely promising" prospects for FDA approval was false or misleading when made. As discussed previously, Defendants had a reasonable basis for believing that DepoCyt had advantages over MTX in treating solid tumor NM, including increased response rates, greater survival and quality of life benefits. The FDA's subsequent rejection of DepoCyt's application does not render Erickson's earlier statements of optimism false or misleading. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir.1995) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud[.]"). Defendant Erickson's optimism concerning regulatory approval of DepoCyt was vindicated, at least in part, by the Canadian government's approval of DepoCyt for treatment of NM from lymphoma and solid tumors, and the FDA's subsequent approval of DepoCyt for treatment of NM from lymphoma. (CSAC ¶¶ 3, 89, 91; Defs. Ex. S.)

Plaintiffs allegations of fraud as to these statements are a classic example of fraud by hindsight. The Court **DISMISSES WITH PREJUDICE** paragraphs 77–79.

### F. *FALSE STATEMENTS—SYNTHESIS*

Plaintiffs have failed to comply with the Reform Act or Rule 9(b) as to any of Defendants' allegedly false or misleading statements during the Class Period. The Second Amended Complaint blends hindsight with speculation and distorts Defendants' public statements. In total, the Second Amended Complaint misleads and confuses its reader far more than any public statement attributed to the Defendants. In the end, Plaintiffs' theory of fraud rests on hindsight-driven criticism prompted by ODAC's ultimate refusal to recommend approval of DepoCyt. As noted by one court:

> Defendants, like · any other company wishing to publicly discuss the results of a scientific study, had to make a judgment as to which specific bits of information about the study and its conclusions to disclose. With the advantage of hindsight, defendants' judgment as to which information to disclose is subject to challenge; however, this does not amount to "facts explaining why the difference between the earlier and later statements is not merely the difference between two permissible judgments, but rather the result of a falsehood."

*Padnes v. Scios Nova, Inc.*, No. C 95–1693 MHP, 1996 WL 539711, at *5 (N.D.Cal. Sept.18, 1996) (quoting *GlenFed*, 42 F.3d at 1549). The Court therefore GRANTS Defendants' motion to dismiss for failure to comply with Rule 9(b) and the Reform Act, 15 U.S.C. § 78u–4(b)(1).

### 2. *SCIENTER*

■ Defendants also challenge whether Plaintiffs have adequately pled the element of scienter, the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). A plaintiff may establish scienter by showing intentional, knowing or reckless conduct. *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990) (en banc). As clarified by the Ninth Circuit, however, "recklessness only satisfies scienter under § 10(b) to the extent it reflects some degree of intentional or knowing misconduct." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir.1999). Under the Reform Act, complaints alleging violations of Section 10(b) or Rule 10b–5 must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). This provision requires "a private securities plaintiff . . ., [to] plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics*, 183 F.3d at 974.

Determining whether the Second Amended Complaint adequately pleads scienter is a more difficult task where, as here, the plaintiff has failed to demonstrate that the defendant made any false or misleading statements. In this situation, scienter entails the illogical inquiry into whether the defendant intended to deceive when, in fact, there was no deception. To the extent Defendants made any arguably false or misleading statements during the Class Period, however, the Court finds that Plaintiffs have also failed to adequately plead scienter under the Reform Act.

Plaintiffs primarily contend that Defendants acted with scienter because, throughout the Class Period, they had access to various documents which revealed the alleged problems with the DepoCyt clinical trials. Specifically, Plaintiffs argue:

> The defendants had actual knowledge that each of the representations alleged herein was materially false and misleading when/made . . . based on the Compa-

ny's own submissions to the FDA, including (a) the protocol for the NM study; (b) the CRFs; containing the patient data from the study; (c ) the AE [Adverse Experience] forms which reported Serious Adverse Experiences in patients in the NM study, and summaries of the foregoing data; (d) the NDA filed with the NDA between November 1997 and April 1997, which is required and did contain all of the foregoing information; and (e) communications with the FDA regarding foregoing matters. (CASC ¶ 92.) This paragraph fails to satisfy the particularity requirement of the Reform Act. Plaintiffs fail, for example, to identify the portions of the multi-volume NDA that support an inference of scienter. Plaintiffs make no attempt to specifically identify any case report form or adverse experience report. To make matters worse, the document categories listed above span thousands of pages and cover virtually every document generated in connection with the DepoCyt clinical trials.

Plaintiffs' remaining scienter allegations fail because they rely explicitly on the allegedly false or misleading statements discussed above. Plaintiffs claim that Defendants had scienter because, for example, (1) Defendants knew the definition of "response" contained in the original NM study protocol because Defendant Kim specifically discussed that definition with the FDA in 1993, (2) Defendants specifically reported the August 1995 clinical results in their Form 10–K filed in April 1996, (3) Defendants knew that nine DepoCyt patients were not evaluable for "response" pursuant to the protocol-specified criteria. (*Id.* ¶ 93(a)-(b) & (h).) As discussed above, Plaintiffs have failed to show that any of Defendants' public statements, including their statements concerning DepoCyt patient "response" rate, were false or misleading when made. The Court finds Plaintiffs' remaining allegations of scienter

so vague and speculative that they warrant no further consideration by the Court.

## VII. *THE MERITS OF PLAINTIFFS' SECTION 20(A) CLAIM*

■ Plaintiffs' remaining claim alleges controlling person liability under Section 20(a) of the Exchange Act. (*See* CSAC ¶¶ 101–103.) "To be liable under section 20(a)," however, "the defendants must be liable under another section of the Exchange Act." *Heliotrope General, Inc. v. Ford Motor Co.,* 189 F.3d 971, 978 (9th Cir.1999). Because Plaintiffs have failed to state a claim under Section 10(b) and Rule 10b–5, they necessarily cannot state a claim under Section 20(a).

## VIII. *GRANTING LEAVE TO AMEND WOULD BE FUTILE*

Defendants ask this Court to dismiss Plaintiffs' Second Amended Complaint without leave to amend.

In deciding whether to grant leave to amend, district courts may consider several factors including undue delay, prejudice to the opposing party, futility of the amendment, bad faith and whether plaintiff has previously amended the complaint. *See Kaplan v. Rose,* 49 F.3d 1363, 1370 (9th Cir.1994). "Although there are strong public policy justifications urging liberality in granting leave to amend, futility of amendment can, by itself, justify the denial of ... leave to amend." *Gentala v. City of Tucson,* 213 F.3d 1055, 1061 (9th Cir.2000) (internal quotations and alteration omitted). "A district court's discretion to deny leave to amend is particularly broad where, as here, a plaintiff has already had a previous opportunity to amend its complaint." *Reiger v. Price Water House Coopers LLP,* 117 F.Supp.2d 1003, 1014 (S.D.Cal.2000).

It does not appear that further amendment will generate any new allegations capable of averting dismissal. Although

they have had several opportunities to amend their pleadings, Plaintiffs have failed to draft a complaint that even comes close to complying with the Reform Act and Rule 9(b). Plaintiffs do not identify any specific factual allegations they would add to a proposed Third Amended Complaint. The Court therefore declines to grant leave to amend because it would constitute an exercise in futility.

## IX. *CONCLUSION AND ORDER*

In light of the foregoing, the Court **GRANTS** Defendants' motion to dismiss the Second Amended Complaint, **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion to compel and to strike, and **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to strike the Dr. Makuch affidavit. (Doc. Nos.73–1, 80–1, 80–2, 71–1.)

The Court **DISMISSES** this action, as to all parties and claims, **WITH PREJUDICE** and without leave to amend. The Clerk of Court shall close the district court case file.

**IT IS SO ORDERED.**