In re PEERLESS SYSTEMS, CORP.
SECURITIES LITIGATION

This Document Relates To: All Actions

No. 00cv1725–L(RBB).

United States District Court,
S.D. California.

Jan. 14, 2002.

Jeffrey R. Krinsk, Mark L. Knutson, Finkelstein & Krinsk, San Diego, CA, for Plaintiffs.

Nina Locker, Ellen Hedy Solomon, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, for Peerless Systems Corp.

Francis Michael Gregorek, Wolf, Haldenstein, Adler, Freeman & Herz, San Diego, CA, for Edward A. Gavaldon, Thomas B. Ruffolo and Robert Johnson.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE AMENDED AND CONSOLIDATED COMPLAINT

LORENZ, District Judge.

This matter came on regularly for a hearing on Defendants' motions to dismiss the Amended and Consolidated Complaint. Jeffrey Krinsk of Finkelstein & Krinsk appeared for the Plaintiffs. Nina Locker and Ellen Solomon of Wilson Sonsini Goodrich & Rosati appeared for Defendants.

---

1. Gavaldon and Ruffolo are hereinafter collectively referred to as the "Individual Defendants."

## BACKGROUND

Plaintiffs bring this action on behalf of purchasers of shares of Peerless Systems Corporation (hereinafter referred to as "Peerless" or "Company") securities from June 11, 1999, through May 25, 2000, inclusive ("Class Period"). (Amended and Consolidated Complaint ("AC") ¶ 1.) Peerless is a leading provider of software-based embedded imaging and networking systems to original equipment manufacturers ("OEM") of digital document products. (AC ¶ 10.) During the Class Period, Defendant Edward A. Gavaldon ("Gavaldon") was the Chairman, Chief Executive Officer, and President of the Company, and Defendant Thomas B. Ruffolo ("Ruffolo") was its Vice President. (AC ¶¶ 11–12.) [1]

Plaintiffs contend that Defendants artificially inflated the price of Peerless stock to maximize the use of the stock as "currency" to acquire two companies and also to allow the Individual Defendants to sell their personal stock holdings at inflated prices. (AC ¶¶ 29–30.) According to Plaintiffs, Defendants' misrepresentations and omissions caused Peerless stock to trade in the range of $9.00 per share on the first day of the Class Period, June 11, 1999. (AC ¶ 31.) On that date, Peerless announced the acquisition of Auco, Inc. for 890,000 shares of stock. (AC ¶ 29.)

Plaintiffs allege Defendants intentionally disseminated material misinformation to the market and that Defendants also omitted to divulge material information to the market. As a result, on August 2, 1999, Hambrecht and Quist analyst Matt Belkin ("Belkin") issued a BUY rating for Peerless stock. (AC ¶ 32.) On August 19, 1999, Peerless announced its second quarter results for fiscal year 2000, and the price of Peerless' stock rose to approxi-

mately $15.00 per share. (AC ¶¶ 33–34.) The Company's 10Q reported the following business development:

In certain cases, the Company enters into agreements with customers that require guaranteed minimum royalty payments. These payments typically extend over a period of four to eight quarters. The Company generally recognizes revenue on delivery, when collection of the resulting receivable is probable and when the fee is fixed and determinable.

Over the past several quarters, the company has experienced shift in its business and financial model. The Company generates revenue from its OEMs through the sale of embedded imaging solutions in either turnkey or software development kit form. Historically, OEM demand for turnkey solutions has exceeded demand for SDK [software development kit] solutions. Additionally, the Company has expanded its solution offering by incorporating related embedded imaging and networking technologies licensed from third parties, which in future quarters could result in incremental SDK, services and royalty revenue streams.

As noted above, the Company has recently experienced a shift away from the turnkey solutions to the sale of SDKs, particularly for its monochrome solutions, which incorporate more mature technology. The shift to SDK sales has resulted in an increase in the products shipping, as OEMs who utilize Peerless SDKs develop and introduce multiple products. Turnkey solutions are expected to continue in color and MFP where the technology is certain to evolve and where the turnkey development challenge is more difficult for OEMs to assume.

(AC ¶ 34) (emphasis omitted). On August 25, 1999, Belkin reported on the Company's second quarter 2000 10Q, issuing a BUY rating and stating that Peerless reported a 14% increase in revenue and a 20% increase in gross profit. (AC ¶ 33.) Belkin also issued BUY recommendations on October 19, 1999, and November 2, 1999. (AC ¶ 35.)

On December 7, 1999, Peerless announced its acquisition of HDE, Inc. for 890,000 shares, which was completed on December 22, 1999. (AC ¶¶ 29, 37.) After this acquisition, Peerless stock began to decline. (AC ¶ 38.) On March 2, 2000, Peerless announced fiscal year 2000 results, and disclosed a fourth quarter decline in revenues of 23% and a 37% drop in gross profits. *Id.* The Company's 10K attributed the Company's 22% increase in year over year licensing revenues to:

an increase in the number of products shipped into the marketplace incorporating Peerless's imaging and networking technology, an increase in the market penetration of existing products, and an increase in the market penetration of existing products, and an increase in sales of SDKs. Additionally, during the fiscal 2000, the Company successfully negotiated a contract modification and extension with a major OEM resulting in the combination of a new sale and recognition of revenue previously deferred of a total of $1.0 million in product OEMs and an increase in guaranteed minimum royalty commitments.

. . .

In December 1999, the Securities and Exchange Commission issued Staff Accounting Bulletin No. 101 (SAB 101), "Revenue Recognition in Financial Statements." SAB 101 provides guidance for revenue recognition under certain circumstances. The Company is currently evaluating the impact of SAB 101 on its financial statements and related disclosures but does not expect such impact, if any, will be material. The

accounting and disclosures prescribed by SAB 101 will be effective no later than the second quarter of the first fiscal year beginning after December 15, 1999, as amended by.

Revenue Recognition: The Company recognizes revenues in accordance with Statement of Position 97–2 "Software Revenue Recognition" as amended by Statement of Position 98–4.

*Id.*

Plaintiffs contend Defendants' misrepresentations and omissions concealed Peerless' true condition—that it was being forced to change its business model because it was no longer capable of competing properly to sustain its prior market competencies. (AC ¶ 39.) This change in Peerless' business model also "substantially increased the risk associated with it being successful." *Id.* In addition, Plaintiffs argue that Peerless' reliance on "block licenses" made Defendants' earlier representations false and misleading, and that SAB 101 would substantially impact reported earnings and cause a precipitous decline in margins. *Id.*

Plaintiffs further contend that Peerless was improperly recognizing revenue. (AC ¶ 40.) In particular, Peerless would regularly enter into contracts with customers which would take several months or a year to complete, and although complete payment for the contract would not be due until its completion, Peerless would be paid one third of the contract price upfront to be used for certain development and overhead costs. (AC ¶ 41.) Plaintiffs allege Peerless improperly reported these contract pre-payments as instant revenue in order to meet or exceed analysts' expectations and to artificially inflate the price of the Company's stock. (AC ¶ 40.) Plaintiffs contend the Company should not have recognized the revenue because there was great uncertainty that the contracts would ever be completed, that Peerless

would be paid by the customers, or even make any income on the sales even if it was eventually paid on the balance due on the contracts. (AC ¶ 42.) Peerless so relied on recognition of these pre-payments as income that Defendants directed or recklessly encouraged the sales department to underbid on contracts to get prepayments. (SAC ¶ 43.) This scheme, according to Plaintiffs, violated various Generally Accepted Accounting Principles ("GAAP") and Securities and Exchange Commission ("SEC") reporting requirements. (AC ¶¶ 46–51.)

On April 13, 2000, Gavaldon ceased working at Peerless. (AC ¶ 44.) On May 25, 2000, the Company announced that:

> Peerless previously reported its strategy of shifting sales to higher-margin SDKs, which has resulted in a revenue trough between the time a project begins and the point at which the customer ships product.

(AC ¶ 45.) The price of Peerless stock declined as licensing revenue dropped 70% and gross profits 85% when compared to the prior fiscal period. *Id.*

Plaintiffs thereafter filed several class actions alleging violations of sections 10(b) and 20(a) of the Securities and Exchange Act and Rule 10b–5 promulgated by the Securities and Exchange Commission. The cases were consolidated into the instant case number, and Plaintiffs filed an Amended and Consolidated Complaint that is the subject of the instant motion to dismiss.

## DISCUSSION

### I. *Applicable Law Regarding Motions to Dismiss Securities Class Actions.*

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). Dismiss-

al of a claim under this Rule is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Navarro,* 250 F.3d at 732. Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 534 (9th Cir.1984); *see Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."). Alternatively, a complaint may be dismissed where it presents a cognizable legal theory yet fails to plead essential facts under that theory. *Robertson,* 749 F.2d at 534.

■ In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir.1996). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *Roberts v. Corrothers,* 812 F.2d 1173, 1177 (9th Cir.1987); *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981). When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the Court takes judicial notice. *Parrino v. FHP, Inc.,* 146 F.3d 699, 705–06 (9th Cir.1998); *Branch v. Tunnell,* 14 F.3d 449, 453–54 (9th Cir.1994); *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986). In addition, the court may consider "documents crucial to the plaintiff's claims, but not explicitly incorporated in his complaint." *Parrino,* 146 F.3d at 706.

Section 10(b) of the Securities and Exchange· Act of 1934 makes it unlawful to use in connection with the mails or facilities of interstate commerce any "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commissioner may prescribe." 15 U.S.C. § 78j. SEC Rule 10b–5, promulgated under section 10(b), provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■ In order for Plaintiffs to properly allege their first claim of relief brought under section 10(b) of the Exchange Act and SEC Rule 10b–5, they must state the following: (1) defendants made a false statement or omission with regard to a material fact; (2) in connection with the purchase or the sale of a security; (3) with scienter; (4) upon which plaintiff reasonably relied; (5) to his/her harm or detriment. *Binder v. Gillespie,* 184 F.3d 1059, 1063 (9th Cir.1999), *cert. denied,* 528 U.S. 1154, 120 S.Ct. 1158, 145 L.Ed.2d 1070 (2000); *Paracor Fin., Inc. v. General Elec. Capital Corp.,* 96 F.3d 1151, 1157 (9th Cir.1996). Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,*

425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 975 (9th Cir.1999).

In December of 1995, Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA") to establish uniform and stringent pleading requirements for securities fraud actions. The PSLRA specifies the required pleading standard for securities fraud actions:

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1).

■ In addition, the PSLRA requires complaints alleging federal securities fraud to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). As recently interpreted by the Ninth Circuit, this language requires a private securities plaintiff to plead particular facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct. *In re Silicon Graphics,* 183 F.3d at 977, 979. Recklessness satisfies the scienter requirement only insofar as it reflects "a degree of recklessness that strongly suggests actual intent." *Id.* at 979.

■ The PSLRA codifies a pleading standard similar to Federal Rule of Civil Procedure 9(b)'s particularity requirement. *DeMarco v. DepoTech Corp.,* 149 F.Supp.2d 1212, 1222–23 (S.D.Cal.2001). Under Ninth Circuit caselaw, Rule 9(b) imposes two distinct requirements on complaints alleging securities fraud. First, the basic notice requirements of Rule 9(b) require the complaint to "state precisely the time, place, and nature of the misleading statements, misrepresentations, or specific acts of fraud." *Kaplan v. Rose,* 49 F.3d 1363, 1370 (9th Cir.1994); *DeMarco,* 149 F.Supp.2d at 1223. The Rule imposes a second requirement that the complaint "set forth an explanation as to why the statement or omission complained of was false and misleading." *Yourish v. California Amplifier,* 191 F.3d 983, 993 (9th Cir.1999) (*quoting In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994) (en banc)); *DeMarco,* 149 F.Supp.2d at 1223. A complaint may demonstrate the false or misleading character of a statement by identifying inconsistent contemporaneous statements made by the defendants or inconsistent contemporaneous information that was available to the defendants. *Yourish,* 191 F.3d at 994; *In re GlenFed,* 42 F.3d at 1549; *DeMarco,* 149 F.Supp.2d at 1223. Even before the PSLRA, the Ninth Circuit held that a complaint may not demonstrate that a statement was false or misleading when made "merely by pointing to later inconsistent statements or conditions." *In re GlenFed,* 42 F.3d at 1548; *DeMarco,* 149 F.Supp.2d at 1223.

The PSLRA further provides that "the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met." 15 U.S.C. § 78u–4(b)(3)(A).

## II. *Plaintiffs' Section 10(b) Claim.*

The crux of Plaintiffs' complaint is that Defendants failed to disclose the Company

had changed its business model in a way that substantially increased the risks associated with its being successful and that this change was made because it was no longer able to compete effectively in its previously represented core competencies. In addition, Plaintiffs maintain Peerless failed to disclose it had adopted a revenue recognition policy that improperly and prematurely recognized contract pre-payments as instant revenue. Defendants argue the complaint does not meet the applicable pleading requirements because it fails to plead all facts upon which its allegations are based. Defendants further contend the AC does not allege any actionable false statement, and that the structure of complaint makes it difficult to understand the nature of Plaintiffs' claims. Defendants' next challenge is that the AC lacks allegations giving rise to a strong inference of scienter, and finally, Defendants state the AC improperly seeks to hold Ruffolo liable for statements he did not make.

## A. Misrepresentations and Omissions About the Company's Business Model and SAB 101.

Plaintiffs allege the Defendants misrepresented and failed to disclose that Peerless had changed its business model in a way that substantially increased the risks associated with its being successful and that this change was made because it was no longer able to compete effectively. (AC ¶ 39.) Plaintiffs further allege that contrary to Defendants' representations, SAB 101 had a material impact on the Compa-

ny's reported earnings and margins. *Id.* The Court agrees with Defendants that the AC's allegations regarding Defendants' purported misrepresentations and omissions fail to meet the pleading requirements imposed by the PSLRA as interpreted by the Ninth Circuit.

First, insofar as Plaintiffs contend that Peerless could not compete effectively, the AC is conclusory. There are no factual allegations to support that statement, such as how the Company was failing in comparison to its competition, in what areas, against which competitors, and during what time period. Similarly, the AC contains no facts supporting Plaintiffs allegation that SAB 101 materially affected the Company's reported earnings and margins. In particular, there are no facts alleged explaining how SAB 101 impacted the Company's reported earnings and margins, the magnitude of the impact, or how this impact rendered any statements false or misleading.

■ Next, Peerless' public filings show that Peerless repeatedly disclosed it was experiencing a shift in demand away from turnkey projects and toward increasing sales of source code, or SDKs. For example, in the 10Qs for the periods ending July 31, 1999, and October 31, 1999, Defendants disclosed that "[o]ver the past several quarters, the Company has experienced a shift in its business and financial model.... the Company has recently experienced a shift away from turnkey solutions to the sale of SDKs, particularly for its monochrome solutions." (Maccarone Decl. Exh. 1 at 3–4, Exh. 2 at 3.[2]) Indeed, the AC quotes a portion of the Company's 10Q

---

2. Defendants have requested the Court take judicial notice of: (1) Peerless' public filings with the SEC; (2) Hambrecht & Quist Software Research Notes by Matt Belkin; and (3) Yahoo! Finance Historical Quotes Chart for Peerless. Plaintiffs have not challenged this request. Further, SEC filings are properly considered on a motion to dismiss where the

plaintiffs relied on them in forming their allegations. *In re Silicon Graphics*, 183 F.3d at 986; *DeMarco*, 149 F.Supp.2d at 1218; *Plevy v. Haggerty*, 38 F.Supp.2d 816, 821 (C.D.Cal. 1998). Similarly, a court can take judicial notice of analyst reports that the complaint relies upon. *c.f. Plevy*, 38 F.Supp.2d at 821.

for the period ending July 31, 1999, wherein Peerless discussed "a shift in its business and financial model." (*See* AC ¶ 34.) In the 10K filed for the fiscal year ending January 31, 2000, Peerless also disclosed its "shift in its business and financial model . . . a shift away from turnkey solutions to the sale of SDKs." (Maccarone Decl. Exh. 8 at 3.)

Moreover, these SEC filings disclosed the risks associated with the change in business model. In particular, they disclosed that "SDK design wins result in development license revenue that is typically recognized in one quarter and is generally lower in magnitude to turnkey design wins prior to product launch but generates higher profitability than engineering services revenues associated with turnkey design win." (Maccarone Decl. Exh. 1 at 5, *see* Exh. 2 at 5, Exh. 8 at 5.) Peerless also disclosed that:

> Because the Company must maintain a certain level of engineering staff, the Company requires a minimum level of demand for turnkey projects in order to profitably maintain its engineering services operations. *If the trend towards SDKs and away from turnkey design wins were to accelerate, the Company may experience insufficient demand for engineering services requiring a redeployment of engineering resources to the research and development department. Accordingly, its results of operations could be negatively affected in the interim.*

(Maccarone Decl. Exh. 1 at 5, *see* Exh. 2 at 5, Exh. 8 at 5.)

The Company also disclosed that its recurring licensing fee model shifted from per unit royalties paid upon OEM shipment of product to a revenue structure that includes more revenues associated with guaranteed quarterly minimum royalties and sales of block licenses. (Maccarone Decl. Exh. 2 at 6, Exh. 8 at 5–6.) Peerless stated that while this new royalty model "benefits the Company's cash flows and minimize[s] the Company's risk associated with [ ] unexpected decreases in demand for customer products, the Company's revenues could fluctuate significantly from quarter to quarter as the number and value of new royalty commitments changes." (Maccarone Decl. Exh. 2 at 6, Exh. 8 at 6.)

Although Plaintiffs challenge these disclosures, arguing that the PSLRA's safe harbor provision is inapplicable, they do not provide any analysis on this point. Further, Plaintiffs' opposition brief fails to account for these disclosures or explain how the Defendants' change in business model constitutes actionable securities fraud in light of those disclosures. Accordingly, as currently pleaded, the AC does not properly allege a misrepresentation or omission based on Peerless' change in its business model. Plaintiffs will, however, be given an opportunity to amend the complaint's allegations regarding this issue. In so doing, to the extent Plaintiffs rely on statements made by analysts, they must also allege sufficient facts showing " 'that the insider provided misleading information to an analyst, that the analyst relied on this information in preparing a report and that the insider somehow endorsed or approved the report prior to or after its publication.' " *Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1349 (S.D.Cal.1998) (*quoting Stack v. Lobo,* 903 F.Supp. 1361, 1372 (N.D.Cal.1995)).

## B. Improper Revenue Recognition.

Plaintiffs also contend Defendants failed to disclose Peerless had adopted a revenue

---

Accordingly, Defendants' request is GRANTED insofar as the Court has relied on those documents for its analysis, and the Court takes judicial notice of them under Federal Rule of Evidence 201.

recognition policy that improperly and prematurely recognized contract pre-payments as instant revenue. (AC ¶¶ 40–43, 47–51.) Plaintiffs maintain this improper accounting supports an inference of scienter. Defendants challenge these allegations, arguing that Plaintiffs fail to plead facts in support of their claim of accounting fraud, and further, that Peerless' recognition of contract pre-payments as revenue was proper under ARB 45. Plaintiffs respond that they are not required to allege specific transactions for which revenue was improperly recorded. In support of their position, Plaintiffs cite *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir.1997) and *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 927 (9th Cir.1993). Plaintiffs further assert that the Company's revenue recognition policy violates SAB 101 and Statement of Position 97–2 because the revenue should only have been recognized once the product was delivered.

Plaintiffs' reliance on *Cooper* and *Wells Fargo* is misplaced. Although the Ninth Circuit decided *Cooper* in 1997, the court stated that it applied pre-PSLRA pleading standards because the action had been commenced before December 22, 1995. *Cooper*, 137 F.3d at 628 n. 2; *In re PETs-MART, Inc. Sec. Litig.*, 61 F.Supp.2d 982, 998 (D.Ariz.1999). Accordingly, *Cooper's* analysis of what is sufficient to plead accounting fraud is inapplicable to this action, which is governed by the PSLRA as interpreted by the Ninth Circuit. *Wells Fargo* is also a pre-PSLRA case, and there, the plaintiffs identified the defendants' deliberate failure to disclose the status of certain specific loans extended to identified borrowers. *In re Wells Fargo*, 12 F.3d at 926–27.

■ "Properly pled, overstating of revenues may state a claim for securities fraud, as under GAAP, 'revenue must be earned before it can be recognized.'" *Hockey v. Medhekar*, 30 F.Supp.2d 1209,

1216 (N.D.Cal.1998) (*quoting Provenz v. Miller*, 102 F.3d 1478, 1484 (9th Cir.1996)). "'To properly state a claim for accounting fraud, plaintiffs must 'plead facts' sufficient to support a conclusion that [d]efendant [ ] prepared the fraudulent financial statements and that the alleged financial fraud was material.'" *Id.* (*quoting In re Oak Tech. Sec. Litig.*, 1997 WL 448168, *8 (N.D.Cal.1997)) (alterations in original). Violations of GAAP standards can provide evidence of scienter. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir. 1999); *see In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1273 (N.D.Cal.2000) ("However, when significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves."). "To support even a reasonable inference of scienter, however, the complaint must describe the violations with sufficient particularity; 'a general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation.'" *Greebel*, 194 F.3d at 203 (*quoting Gross v. Summa Four, Inc.*, 93 F.3d 987, 996 (1st Cir.1996)).

■ Contrary to Plaintiffs's contention, when pleading irregularities in revenue recognition, plaintiffs should allege "basic details as the approximate amount by which revenues and earnings were overstated," "the products involved in the contingent transaction," "the dates of any of the transactions," or "the identities of any of the customers or [company] employees involved in the transactions." *Id.* at 204; *accord In re McKesson*, 126 F.Supp.2d at 1273. Plaintiffs need not allege *each* of those particular details, *see Greebel*, 194 F.3d at 204, but they must allege enough information so that "a court can discern whether the alleged GAAP violations were

minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *In re McKesson*, 126 F.Supp.2d at 1273. Here, the AC does not identify any specific transactions in which contract pre-payments were recognized as revenue, nor provide any details regarding those transactions. Accordingly, the AC does not meet the applicable pleading requirements.

Further, it is questionable whether as pleaded, the AC's allegations of the Company's recognition of contract pre-payments constitutes accounting fraud. The AC alleges that Defendants violated SOP 97–2, *Software Revenue Recognition*, which requires that revenue can only be recognized where (1) persuasive evidence of an arrangement exists, (2) delivery has occurred, (3) the vendor's fee is fixed or determinable, and (4) collectibility is probable. (AC ¶ 50(c); Maccarone Supp. Decl. Exh. 2 at 2.) But these criteria only apply where "the arrangement does not require significant production, modification, or customization of software." (Maccarone Supp. Decl. Exh. 2 at 2.) Under SOP 97–2, "[i]f an arrangement to deliver software or a software system, either alone or together with other products or services, requires significant production, modification, or customization of software, the entire arrangement should be accounted for in conformity with Accounting Research Bulletin (ARB) No. 45, Long–Term Construction–Type Contracts, using the relevant guidance herein, and in SOP 81–1, Accounting for Performance of Construction–Type and Certain Production–Type Contracts." (Maccarone Supp. Decl. Exh. 2 at 1.) Further, SAB 101, which Plaintiffs rely upon, states that "[i]f a transaction is within the scope of specific authoritative literature that provides revenue recognition guidance, that literature should be applied." (Hartlett Decl. Exh. D at 2.) Paragraphs 41 and 42 of the AC establish that the contract pre-payments Peerless purported-

ly improperly recognized was one-third of the contract price that would "be used for certain development and overhead costs." (AC ¶¶ 41, 42.) Accordingly, it appears that the pre-payments are not software license fees to which SOP 97–2 applies. Rather, ARB 45 states that income earned on development projects is properly recognized on a percentage-of-completion basis, (*see* AC ¶ 50(d)), so as alleged in the AC, it appears the Company properly recognized the pre-payments under ARB 45. However, because the AC fails to allege any specifics of the transactions, this Court cannot definitively conclude at this time that Defendants' revenue recognition policy comported with applicable GAAP standards and SEC regulations, and therefore Plaintiffs will be given leave to amend their accounting fraud allegations.

### C. Sufficiency of the AC's Remaining Scienter Allegations.

In alleging scienter, the AC not only relies on the accounting improprieties that this Court has found insufficient above in section II.B., but also contends that Defendants had actual knowledge of the fraud because of their positions in the Company and access to company documents and other non-public information. (AC ¶¶ 13–14.) In addition, the Plaintiffs rely on stock sales by the Individual Defendants. (AC ¶ 30.) These allegations are insufficient to raise a strong inference of scienter.

#### 1. Scienter Allegations Based on the Individual Defendants' Actual Knowledge.

In support of their contention that Defendants acted with scienter, Plaintiffs contend the Defendants knew of the misstatements, omissions, and improper revenue recognition because of their positions in the Company and because they had access to internal Company documents.

(AC ¶¶ 13–14; Plts' Oppo. at 11–12.) Plaintiffs further contend that the misstatements, omissions, and accounting improprieties were material. (AC ¶¶ 13–14; Plts' Oppo. at 11–12.) Plaintiffs' arguments and allegations are conclusory and insufficient under Ninth Circuit law. Published decisions in the Ninth Circuit hold that a complaint does not adequately plead scienter by claiming that key officers knew the true facts by virtue of their "hands-on" positions and involvement in the day-to-day management of the company. *In re Splash Tech. Holdings, Inc. Sec. Litig.,* 160 F.Supp.2d 1059, 1080–81 (N.D.Cal. 2001); *In re Autodesk, Inc. Sec. Litig.,* 132 F.Supp.2d 833, 843–44 (N.D.Cal.2000); *see In re Read–Rite Corp. Sec. Litig.,* 115 F.Supp.2d 1181, 1185 (N.D.Cal.2000) (holding that "one *reasonably* could infer that persons with [the defendants'] respective job titles would be aware of major developments concerning a key customer's refusal to implement a major product line. However, under current law, the mere existence of a reasonable inference does not satisfy the Reform Act's requirement of a strong implication.") (emphasis in original).

For example, in *In re Splash,* the SAC alleged that the individual defendants were "hands on" managers in "constant contact" with the company's two sole customers and that they knew of the true facts because of unspecified internal corporate documents, unspecified conversations with unspecified corporate officers and employees, attendance at unspecified management and/or Board meetings, unspecified order intake and backlog reports, and unspecified disclosures and data from the company's customers. *In re Splash,* 160 F.Supp.2d at 1079. The court found these allegations insufficient because the complaint: (1) did not identify the internal corporate documents by identifying their contents, who prepared them, which officers reviewed them, and from whom plaintiffs obtained the information; (2) did not identify any specific conversations between specific officers and employees; (3) did not identify any specific management or Board meeting at which adverse non-public information was disclosed or discussed; (4) did not identify any specific "order intake reports," "backlog reports," or "shipment reports" that reflected the information; and (5) did not identify any specific information the company's top executives received from the customers, or the circumstances surrounding the receipt. *Id.* at 1080. The court also found the plaintiffs' identification of one of the defendants as having had contact with the company's customers deficient because the complaint did not identify a specific communication between the executive and the customers, the date on which any of those communications occurred, how plaintiffs learned of the communications, the form in which the contact or communication was had, or specifics concerning the information provided or received during the contact. *Id.*

Similarly, in *In re Autodesk,* the plaintiffs alleged scienter based on the defendants' top executive positions in the company, involvement in the day-to-day management of the company's business, and because of weekly internal reports, such as sales reports, order reports, backlog reports, "revenue cycles and trends" reports, "allowance and general reserve" reports, and "monthly and pending danger" reports. *In re Autodesk,* 132 F.Supp.2d at 843–44. The court found these allegations deficient, stating that "plaintiffs must do more than allege that these key officers had the requisite knowledge by virtue of their 'hands on' positions, because that would eliminate the necessity for specially pleading scienter, as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position." *Id.* at 844; *accord In re Splash,* 160 F.Supp.2d at 1081 n. 17.

Under this authority, the AC's scienter allegations based on "actual knowledge" by the Individual Defendants are deficient. There are no allegations identifying specific conversations, Board meetings, or reports where these individuals purportedly learned of the true and adverse information. Further, there are no facts supporting the AC's allegation the Defendant directed sales personnel to underbid on contracts, or otherwise directed the alleged improper revenue recognition.

■ Moreover, the AC's failure to plead with particularity its sources of information undermines its allegations regarding scienter. The AC is based upon investigation of counsel, (AC at 1), which it is equivalent to being based upon information and belief. *In re Silicon Graphics Sec. Litig.*, 970 F.Supp. 746, 763–64 (N.D.Cal.1997), *aff'd*, 183 F.3d 970. When pleading on information and belief, the PSLRA requires plaintiffs to *"state with particularity all facts"* on which their belief is based. 15 U.S.C. § 78u–4(b)(1) (emphasis added). Defendants contend that the AC fails to allege any facts, much less all facts, forming the basis for its information and belief allegations. Plaintiffs respond that *Silicon Graphics* does *not* require them to plead the sources of their information. Rather, Plaintiffs argue that "[t]he PSLRA merely requires that the complaint shall state with particularity all 'facts,' not sources." (Plts' Oppo. at 14.) Plaintiffs maintain that the identity of witnesses interviewed during a pre-suit investigation is protected work product, and that courts do not require litigants to divulge their confidential sources due to the threat of retaliation against whistleblowers.

*Silicon Graphics* and the PSLRA require Plaintiffs to allege "the specific content of the documents upon which the plaintiff relied, identifying who prepared and who reviewed them, and setting out 'sources of . . . information with respect to the reports.'" *In re Vantive Corp. Sec. Litig.*, 110 F.Supp.2d 1209, 1215–16 (N.D.Cal.2000) (*quoting Silicon Graphics*, 183 F.3d at 985). In *Silicon Graphics*, for example, the Ninth Circuit found insufficient the complaint's allegation that the plaintiff had reviewed "SEC filings, securities analysts reports and advisories about the Company, press releases issued by the Company, media reports about the Company and discussions with consultants" and that she believed additional evidentiary support would reveal more corroborating facts. *Silicon Graphics*, 183 F.3d at 985. The court found deficient the plaintiff's failure to "mention, for instance, the sources of her information with respect to the reports, how she learned of the reports, who drafted them, or which officers received them. Nor does she include an adequate description of their contents . . . . We would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability." *Id.* The Ninth Circuit further noted that when complaints lack such specifics, the court "cannot determine whether there is any basis for alleging that the officers knew that their statements were false at the time they were made—a required element in pleading fraud." *Id.*

The Honorable William H. Orrick of the Northern District of California has stated that to meet *Silicon Graphics*, "plaintiffs must couple each separate allegation in the [complaint] with details identifying the sources upon which such beliefs are based." *In re Vantive*, 110 F.Supp.2d at 1216 (*citing Silicon Graphics*, 183 F.3d at 985.) Judge Orrick explained "[t]his requirement is the PSLRA's single most important weapon against pleading fraud by hindsight because it forces plaintiffs to reveal whether they base their allegations

on an inference of earlier knowledge drawn from later disclosures or from contemporaneous documents or other facts." *Id.* Nevertheless, Plaintiffs are not required to always name their sources, but rather may, if they provide adequate corroborating details, rely on unnamed sources. *In re McKesson,* 126 F.Supp.2d at 1271 (holding that although in some cases it may be proper to require a plaintiff to identify a source by name, *Silicon Graphics* does not "require naming (as opposed to identification) of sources. It is possible to identify sources and provide other corroborating details without disclosing the names of the sources.").

Accordingly, regardless of whether it would be appropriate in this case to require Plaintiffs to name their sources, the AC fails to identify the sources of the information and also lacks any corroborating details or allegations regarding specific documents upon which Plaintiffs base their claims. Rather, the only allegations regarding the sources of Plaintiff's allegations are that: "Lead Plaintiffs ..., allege upon personal knowledge as to themselves their [ ] own acts, and upon information and believe as to all other matters, based upon, *inter alia,* the investigation conducted by and through their attorneys, which included, among other things, a review of the public documents and announcements, Securities and Exchange Commission ('SEC') filings, and press releases regarding Peerless Systems Corp. (hereinafter 'Peerless' or the 'Company'), as follows:" (AC at 1.) These allegations are similar to those found deficient in *Silicon Graphics.* Accordingly, insofar as Plaintiffs contend that scienter is established because the Individual Defendants must have known about the misstatements, omissions, and improper revenue recognition, those allegations are deficient.

## 2. Scienter Based on the Individual Defendants' Stock Sales.

Plaintiffs also rely on the Individual Defendants' stock sales to support their argument Defendants acted with scienter. Unusual or suspicious stock sales can serve as circumstantial inference of scienter. *In re Silicon Graphics,* 183 F.3d at 986; *In re Splash,* 160 F.Supp.2d at 1081; *In re PETsMART,* 61 F.Supp.2d at 999–1000. "But, courts have repeatedly held that the mere existence of stock sales does not raise a strong inference of fraudulent intent. [citation] Plaintiffs have the burden at the pleading stage of explaining why the stock sales were unusual or suspicious." *In re PETsMART,* 61 F.Supp.2d at 1000; *see In re Silicon Graphics,* 183 F.3d at 986. To meet this burden, the plaintiffs must show the trading was " 'in amounts dramatically out of line with prior trading practices, at times calculated to maximize personal benefit from undisclosed inside information.' " *In re PETsMART,* 61 F.Supp.2d at 1000 (*quoting Alfus v. Pyramid Tech. Corp.,* 764 F.Supp. 598, 605 & n. 1 (N.D.Cal.1991)); *In re Silicon Graphics,* 183 F.3d at 986; *In re Splash,* 160 F.Supp.2d at 1081. Here, Plaintiffs allege the Individual Defendants' stock sales "were unusual in amount and kind and reflect the type of intentional and conscious behavior prohibited by the securities laws," but the AC fails to allege any facts supporting that statement. (AC ¶ 30.) Rather, the AC only alleges the number of shares Ruffolo and Gavaldon sold and amounts they received for those sales. *Id.* Although Plaintiffs rely on the Form 4s attached to Defendants' motion to dismiss to argue that Ruffolo and Gavaldon were able to time their stock sales to coincide with the highest prices of the entire Class Period, they have not shown that these Form 4s indicate the sales were out of line with the Defendants' prior trading practices. Accordingly, as pleaded in

the AC, the Individual Defendants' stock sales do not support an inference of scienter.

### III. *Plaintiffs' Section 20(a) Claim.*

Section 20(a) of the 1934 Securities and Exchange Act provides for controlling person liability for every person who, directly or indirectly, controls any person liable under any of the provisions of this title. 15 U.S.C. § 78t(a). To establish control person liability, a plaintiff must show that a primary violation occurred, and that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000); *Heliotrope General, Inc. v. Ford Motor, Co.,* 189 F.3d 971, 978 (9th Cir.1999). Accordingly, because Plaintiffs' section 10(b) claim is being dismissed, the section 20(a) claim is dismissed as well. *Howard,* 228 F.3d at 1065; *Heliotrope,* 189 F.3d at 978.

### *CONCLUSION*

Having considered the parties' briefs, the record, oral argument, applicable law, and good cause appearing, **IT IS HEREBY ORDERED:**

1. Defendants' motion to dismiss is **GRANTED.** The Amended and Consolidated Complaint is **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND.** Plaintiffs shall file and serve an amended complaint within 60 days of the date this order is stamped "Filed."

2. Defendants' request for judicial notice is **GRANTED** insofar as the Court has relied on those documents.

3. The amended complaint shall comply with Federal Rule of Civil Procedure 8, and shall not group together the misrepresentations and omissions. Rather, Plaintiffs must concisely set forth each allegedly false or misleading statement or omission, and follow *each* statement or omission with the specific reasons why the statements were false when made or why the Defendants had a duty to disclose. In addition, the Plaintiffs shall specify which Defendants made the statements, and how and when each of the Defendants knew the "true facts" that should have been disclosed.

4. Plaintiffs are admonished that failure to comply with the requisite pleading standards may subject their complaint to dismissal with prejudice.

**IT IS SO ORDERED.**